**NIEMANN et al. v. ZARSKY et al.**

**No. 4718.**

Court of Civil Appeals of Texas. El Paso.

May 10, 1950.

Rehearing Denied June 14, 1950.

E. Garland Brown, D. B. Chapin and Luther E. Jones, Jr., all of Corpus Christi, for appellants.

Tarlton & Hale, Corpus Christi, J. C. Russell, Sinton, John Stofer, Victoria, Wesley Zarsky, Refugio, for appellees.

SUTTON, Justice.

This is an appeal from the District Court of Refugio County.

The case was tried on the second amended original petition wherein Harry Niemann appeared as plaintiff in the capacity of Guardian of the Estate of August Niemann, a person of unsound mind, and Elsie Niemann, the wife of August Niemann, individually. John L. Zarsky, the Commercial State Bank, Roy Jackson, W. C. Sparks and Addie Smith, as Executrix of the estate of C. C. Smith, deceased, were named defendants.

The purpose of the suit was to cancel a deed of trust executed December 1, 1924, by August Niemann and wife, Elsie Niemann, to secure a note in the principal sum of $4,465.00 payable to Bank of Commerce of Sinton, Texas, the predecessor of the Commercial State Bank, defendant in said suit; a trustee's deed executed pursuant to a sale had under the deed of trust to said Bank, a deed from the Bank to C. C. Smith, and a deed from Smith's legal representative to John L. Zarsky, each conveying 200 acres of land situated in Refugio County, and to recover the land. The plaintiffs also sought an accounting from the defendants and prayed for damages in the event the court found Zarsky to be the lawful owner of the land.

The claimed right to recover was predicated upon two grounds, that Niemann, on the date the deed of trust was executed was of unsound mind, and that the deed of trust was executed as an accommodation to the Bank and upon the express agreement the Bank would manage and use the lands for the purpose of discharging the debt due it and then return the lands to the plaintiffs.

The defendants answered with general denials, Zarsky with a plea of not guilty and of innocent purchaser, and all with various pleas of limitation.

At the conclusion of all the evidence the defendants filed motions for an instructed verdict, which the court granted, and on the instructed verdict rendered judgment against the plaintiffs and in favor of the defendants from which this appeal is prosecuted.

The plaintiffs have two points of error, that the trial court erred in instructing the verdict and rendering judgment thereon, and in enjoining, at the instance of defendants, the plaintiffs from taking the written deposition of the Bank as such.

The law applicable to the case and situation when a trial court instructs a verdict has been many times reiterated, but we repeat it again. A verdict should not be directed for a defendant if, discarding all adverse evidence and giving credit to all evidence favorable to the plaintiff and indulging every legitimate conclusion favorable to the plaintiff which might have been drawn from the facts proved, a jury might have found for the plaintiff. Wininger v. Ft. Worth & D. C. Ry. Co., 105 Tex. 56, 143 S.W. 1150(T). If a plaintiff has introduced sufficient evidence to support a verdict, no matter how strong the contradictory evidence may be, the case should be submitted to the jury. Harpold v. Moss, 101 Tex. 540, 109 S.W. 928(T). If the evidence is of such character that there is no room for ordinary minds to differ as to the conclusion to be drawn from it, then it becomes the duty of the trial court to instruct the verdict. Joske v. Irvine, 91 Tex. 574, 44 S.W. 1059(T).

A son and daughter testified concerning the mental condition and attitude and demeanor of Niemann through the years and said he had a serious illness in 1919, and was never the same thereafter and contrary to his previous years he thereafter was abnormal in his sleeping habits and would sleep many times all day and didn't get up with the family in the mornings; that he would not work but "piddled around" and went about preaching and talking about religion, whereas he had been a good worker and normal in those respects; that he didn't bathe and was unclean in his personal habits and appearance.

He talked about having conversations with Jesus, the angels and the Prophet Daniel, and the daughter said he came in at supper times with new stories about his conversations with Daniel and got angry if you discussed it with him and especially if there was a disagreement about his reports. This behavior and demeanor continued on throughout the years. The son said he would go off on wandering trips and be gone for some days and they would have to go and look him up. He would go into the field and make a few "rounds" and then go off to town. He would get the kids names mixed up. A few days before the deed of trust was executed he and his mother had a conference with a bank official about signing the note and executing the deed of trust. On the return home the father and mother had an argument about the matter and Niemann insisted his wife should not worry about that, saying I am Jesus Christ. God will take care of us for anything we sign; that he was Jesus Christ in this world. Each of these witnesses testified based upon their associations, the conversations and observations of the father all through the years, in their opinion he was insane on December 1, 1924, and incapable of transacting business.

Three other witnesses described as disinterested testified for the plaintiffs on this issue of mental capacity. One said he had known Niemann since 1918, and at times he was a very peculiar man and would not know him and at other times he would meet him and Niemann would slap him on the back and then get off on something else; that he met him on a Sunday and Niemann asked him where he was traveling and he replied going to see about his cattle, whereupon Niemann said the cattle were all right, that the Lord would take care of them; that in 1928 Niemann came to witness's rooming house and took a room. In the night after the witness had gone to sleep Niemann woke him up reading loud verses from the Bible. Another witness testified he knew Niemann before and after World War One and after the war Niemann was not the same as before. He carried on conversations that just didn't make sense. He said he was

Jesus Christ and had the power of Jesus. Niemann didn't work but let the family take care of things. The third witness testified he had been in the real estate, title, loan and abstract business and had known Niemann since 1919, and had considerable business with him. Along in 1921, or 1922, or 1923, he noticed Niemann was not the same person he was when he knew him previously. He would be on a deal and make an engagement and fail to keep it and when brought to his attention later he had forgotten it altogether. He never had a conversation with him that he did not bring up the matter of religion. He would always try to start a sermon which could not be changed. He didn't work but left all that to his wife and children. This witness testified the Niemanns worked at a dairy for him but Niemann did nothing and that all his dealings in the arrangement and operation of the dairy were with the wife. Each of these disinterested witnesses likewise testified, based upon their associations, conversations and dealings, Niemann was, in their opinion, of unsound mind on December 1, 1924.

It must be conceded this testimony is the favorable testimony and that the defendants offered eleven witnesses who testified to the contrary and that much of this testimony concerned dates both prior to and after the crucial date of December 1, 1924. But under the applicable rules of law it must be so considered, and it is not a question of what inferences and conclusions we or others other than the jury might draw and reach.

As is said in the case of Self v. Becker, Tex.Civ.App., 195 S.W.2d 701, (e. r.) in order to render the act done void because of the mental unsoundness, the incapacity must exist at the time the act is done, but the evidence of the incapacity is not limited to the time the act is done, but testimony is admissible as of the time and before and after. The evidence of unsoundness can not be restricted to time limitations. The opinion of one based upon observations made at the crucial time is no better than one based upon observations made at a time

more removed. We take it to be the province of the jury to determine from all the evidence whether or not the incapacity existed at the time of the execution of the instrument. Certainly if it be shown an incapacity existed before and after the crucial date the jury would be justified in concluding it existed on the date.

■ It is our conclusion this issue should have been submitted to the jury.

■■ Under the heading "Constructive Trustee Issue" the plaintiffs contend they were, under the evidence, entitled to have submitted to the jury the issue as to whether or not a relation of confidence existed between the Bank and the Niemanns at the time the deed of trust was executed and a promise by the Bank the land would never be sold under said deed of trust. In support of the contention they rely upon the testimony of Harry Niemann to the effect that just prior to the execution of the deed of trust he and his mother had a conversation with Mr. Jackson, the president of the Bank, wherein his mother for various reasons recited would not agree to execute the instrument, but in response to Mr. Jackson's persuasion and statements that the bank examiner was giving them trouble; that the bank had been good to the Niemanns and that it would be a great accommodation to him and the bank if they would execute it, and that she would never lose the land; that it was a mere piece of paper, she agreed to do so. The instrument was executed and delivered. Under this situation the position is not tenable. When a deed or deed of trust is delivered to the grantee it cannot be an escrow, but becomes an absolute conveyance on which may not be engrafted by parol any condition inconsistent with its terms. Holt v. Gordon, 107 Tex. 137, 174 S.W. 1097(T).

■ It is also contended the evidence would support a jury finding to the effect that in the fall of 1926, the bank took over the possession and management of the lands described in the deed of trust under the agreement that it would be returned to the owners upon the liquidation of the bank's debt. We are not cited to the evidence to that effect. Mr. Jackson testified the bank took over under a very informal agreement and assisted in the operation of the farm through tenants and received the revenues from which taxes were paid, at least in part; the operation expenses and that his bank made some payments on the Federal Land Bank debt. Niemann's daughter testified Mr. Jackson came out and told her mother if she could not meet the payments why didn't they let the bank take over to which the mother agreed and the family moved away. This evidence would not support the finding suggested. The most that may be gleaned from the evidence is the bank became the agent of the owners of the land in the operation of the farm in the fall of 1926, and continued until the sale thereof.

There is one other point. Plaintiffs say the court erred in permanently enjoining the Clerk of the Court from issuing a commission to take the deposition of the bank as such. Plaintiffs filed with the Clerk of the Court a "Notice of Intention to apply for a commission to take the deposition of Commercial State Bank of Sinton on written interrogatories". Attached thereto were 38 interrogatories propounded by plaintiffs, "To be answered under oath by Commercial State Bank of Sinton by its officers, agents, servants or employees". At the instance of the defendants the taking of the deposition was permanently enjoined.

It was determined in the case of Sauermann v. El Paso Electric R. Company, Tex.Com.App., 235 S.W. 548, the deposition of a corporation can not be taken, because it can act only through its officers and agents. Plaintiffs admit, under that decision such was the law prior to 1925, but say since then because of the Act of the 39th Legislature, Acts of 1925, Chapter 179, p. 448, the law is otherwise. That Act amended the then article 3681, R.S. 1911. Prior to the amendment the Article read: "Where either party to any suit is a corporation, neither party thereto shall be permitted to take ex parte depositions."

This is the Act of 1897, under consideration in the Sauermann case, supra. The

1925 Act was the same as Section 10 of Art. 3769, R.S. 1925, and now Section (j), Rule 188, Texas Rules of Civil Procedure. Plaintiffs rely on that portion of Section (j) of the Rule wherein it says: "It is hereby expressly provided that any party to a suit wherein a corporation is a party shall have the right to take written and oral depositions of any party to such suit or of any witness, after giving notice and complying with the other requirements of the rules governing the taking of written or oral depositions of witnesses."

Of course, the same reasons obtain now that were recognized in the Sauermann case as the impediment to taking the depositions of a corporation. We think the purpose of the amendment of 1925 was not to provide for the taking of the deposition of a corporation, a party to the suit, as is contended by the plaintiffs, but to change the rule established by the decision in the Sauermann case and provide for the taking of depositions of parties other than corporations and any witnesses as in other cases, except ex parte depositions. In other words, the prohibition is there limited to ex parte depositions. It is our conclusion the court did not err in enjoining the issuance of the commission.

For the error of the court in declining to submit the issue of mental capacity, under the state of the evidence in the case, and instructing the verdict the judgment of the trial court is reversed and the cause remanded.